UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIELLE SCARBERRY,

    Plaintiff,

v.

                                          Case No. 16-12881

MICHIGAN BELL TELEPHONE COMPANY and
AT&T SERVICES, INC.,                   HON. AVERN COHN

    Defendants.

_____/

## **MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 18).**

### I.    INTRODUCTION

This is a retaliation case under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* (FMLA). Plaintiff Danielle Scarberry (Scarberry) is suing Defendant Michigan Bell Telephone Company (Michigan Bell), her former employer,[1] claiming that she was terminated in retaliation for her use of FMLA leave. Michigan Bell says that there is no genuine issue as to the fact that Scarberry was terminated for violating the employee code of conduct. Scarberry seeks compensatory and liquidated damages, an order reinstating her to her former position at Michigan Bell, and an injunction prohibiting further discrimination or retaliation.

---

[1] Michigan Bell is a wholly owned subsidiary of AT&T Teleholdings, Inc., which is a wholly owned subsidiary of AT&T, Inc.

Now before the Court is Michigan Bell's motion for summary judgment (Doc. 18), to which Scarberry has responded (Doc. 21) and Michigan Bell has replied (Doc. 23). For the reasons that follow, the motion is GRANTED.

## II. BACKGROUND

### A. Employment

On August 25, 2003, Michigan Bell hired Scarberry as a telephonic Sales and Service Representative in its Saginaw, Michigan customer service and sales call center. Scarberry's primary duties included selling AT&T-branded internet, telephone, and television services, and providing customer service. While employed at Michigan Bell, Scarberry was a bargaining unit member of and represented by the Communications Workers of America (CWA).

### B. FMLA Leave Requests

**1.**

The facts relevant to Scarberry's FMLA claim follow, as gleaned from the parties' joint statement of facts (Doc. 28) and other parts of the record as noted below.

**2.**

Between 2004 and 2013, Scarberry requested FMLA leave numerous times to attend medical appointments and procedures, and to care for her mother. Michigan Bell approved all of Scarberry's leave requests.[2] According to the amended complaint (Doc. 9), she took 392 hours of FMLA leave in 2010, 386 hours in 2011, 412 hours in 2012, and 286 hours in 2013.

---

[2] Scarberry disputes this. However, the deposition testimony on which she relies shows that while Michigan Bell did not allow her to leave on one occasion, she did not request FMLA time for that occasion.

In her deposition (Doc. 18-2), Scarberry described several incidents in which her managers and co-workers criticized her for taking FMLA leave. She said she received comments from co-workers such as "part-timer" and "must be nice coming in late, leaving early," as well as comments from managers such as "because you're not here," suggesting that others would have to take on additional work in her absence. Scarberry named Sarah Smolarek (Smolarek), Sherri Breternitz-Prebay (Breternitz-Prebay), Jeanne Kline (Kline), and Laura Tucker (Tucker) among the managers that made the comments. Scarberry noted that she received co-worker comments about once a week, but she could not remember the frequency of manager comments, nor the time frame in which they occurred. Scarberry also said that supervisor Lorraine McMillan (McMillan) refused to defend her when co-workers made comments, stating that "it's not my job to defend you." Scarberry filed multiple complaints with the Michigan Bell human resources and equal employment opportunity offices regarding co-worker comments; the investigations always came back as inconclusive.

Scarberry also testified regarding two incidents related to her use of FMLA leave. On one occasion, Scarberry was present at a staff meeting in which supervisors were admonishing employees for attendance problems. When Scarberry brought up the fact that leave covered by FMLA did not count as poor attendance, McMillan did not address her comment in front of the whole group; instead, she said "I'll talk to you about this later." Scarberry also could not remember when this meeting occurred.

On another occasion during the summer of 2013, Scarberry met with supervisors Kline and Tucker to talk about negative co-worker comments and also to inquire about taking on a leadership position within her service team. Scarberry recalled that one of

3

the two said that "I [Scarberry] needed just to mind my own business" with respect to the co-worker comments, which Scarberry described as "in-office bullying."

**3.**

The parties do not dispute that in the eight months preceding her termination, Scarberry requested and was granted 58 separate FMLA leaves of absence. Not clear is whether this frequency of leave use is similar to or different from that used in other time periods during Scarberry's employment at Michigan Bell. The last time Scarberry requested FMLA leave was on August 8, 2013, in order to care for her mother. Michigan Bell's records state that Scarberry said she had to leave early that day to attend a doctor's appointment.

### C. "Cramming" Incident

**1.**

The facts regarding Michigan Bell's defense follow, as gleaned from the parties' joint statement of facts (Doc. 28) and other parts of the record as noted below.

**2.**

On August 9, 2013, an individual called the Michigan Bell Saginaw call center to complain that Scarberry had changed a customer's internet service account without authorization. This practice is known as "cramming"; it is a terminable offense according to the Michigan Bell employee code of conduct. The complaint came to the attention of Michigan Bell management. An investigatory meeting was held three days later. (Doc. 18-14, Pg ID 312-14).

Present at the meeting were Scarberry, supervisors Smolarek and Breternitz-Prebay, and two CWA officers. The supervisors played back a recording of the call in

question, which reflected that Scarberry told the individual that the change was mandatory. In response, the individual told Scarberry several times that she did not have the authority to approve any changes to the account. Scarberry admits that she made the statements and actions the recording reflected, that she did make a change to the customer's account, and that, contrary to company policy, she did not send a follow-up email to the individual containing the account number and order number after she made the change.

At the end of the meeting, Smolarek told Scarberry that she was suspended pending further investigation. The next week, Michigan Bell changed Scarberry's employment status to "suspended pending termination" (a pre-termination status under the CWA's collective bargaining agreement) and notified her in writing of the change. (Doc. 18-14, Pg ID 310). On August 26, 2013, the Union-Management Review Board held a hearing pursuant to the collective bargaining agreement. CWA representatives attended along with Michigan Bell supervisors Kline and Rick Plant (Plant). At the hearing, Kline and Plant related other telephone calls in which Scarberry had changed customers' service plans without authorization. The meeting minutes (Doc. 18-14, Pg ID 365-75) reflect that for each incident, Scarberry offered reasons why she thought she had authorization to make the change. The minutes also stated that a termination decision would be made by Thursday, August 29, 2013.

On August 28, 2013, Michigan Bell terminated Scarberry. The termination was memorialized in a letter to CWA officer Angela Miller (Miller). (See Doc. 18-14, Pg ID 378). Miller requested that the CWA file an arbitration claim regarding Scarberry's

termination. (See Doc. 18-14, Pg ID 232-34, 376-80).[3] The CWA ultimately decided not to pursue arbitration. (Miller Dep. 29-30). The record does not contain any documentation from the CWA explaining the reasoning behind its decision.

### III. LEGAL STANDARD

Summary judgment will be granted if the moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In doing so, the Court "must view the evidence in the light most favorable to the non-moving party." Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc., 69 F.3d 98, 101-02 (6th Cir. 1995).

### IV. APPLICABLE LAW

#### A. FMLA Retaliation

The FMLA states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 26 U.S.C. § 2615(a)(2). Absent direct evidence of retaliation, the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411

---

[3] Notably, Miller's request for arbitration made no mention of the FMLA or any form of retaliation.

6

U.S. 792 (1973) applies. Marshall v. The Rawlings Co. LLC, 854 F.3d 368, 381 (6th Cir. 2017). Under the framework, a plaintiff must first demonstrate a prima facie case of FMLA retaliation by establishing four elements: "she availed herself of a protected right under the FMLA; her employer knew she availed herself of her right under the FMLA; she suffered an adverse employment action; and there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." Id. at 381 (citing Edgar v. JAC Prod., Inc., 443 F.3d 501, 508 (6th Cir. 2006)).

If a plaintiff succeeds in making out a prima facie case, the burden then shifts to the defendant to show that the adverse employment decision was made for a nondiscriminatory reason. Id. at 379. If the defendant can make that showing, the burden shifts back to the plaintiff "to show that the reason was pretext." Id.

Pretext can be established in either of three ways: "by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." Id. (quoting Donald v. Sybra, Inc., 667 F.3d 757, 762 (6th Cir. 2012)). "[T]o survive summary judgment a plaintiff need only produce enough evidence . . . to rebut, but not to disprove, the defendant's proffered rationale." Griffin v. Finkbeiner, 689 F.3d 584, 593 (6th Cir. 2012) (quoting Blair v. Henry Filters, Inc., 505 F.3d 517, 532 (6th Cir. 2007)) (internal quotation marks omitted). Further, "[t]he three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" Blizzard v. Marion Tech. Coll., 698 F.3d 275, 285 (6th Cir. 2012) (quoting Chen v. Dow Chem. Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "If an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee

7

will not be able to establish pretext." Tingle v. Arbors at Hilliard, 692 F.3d 523, 530–31 (6th Cir. 2012).

### B. Statute of Limitations

The FMLA statute of limitations is two years. 26 U.S.C. § 2617(c)(1). However, in the case of a willful violation of § 2615, the statute of limitations extends to three years. 26 U.S.C. § 2617(c)(2). A violation is willful if "the employer intentionally or recklessly violated the FMLA." Crugher v. Prelesnik, 761 F.3d 610, 617 (6th Cir. 2014) (quoting Hoffman v. Prof'l Med Team, 394 F.3d 414, 417 (6th Cir. 2005)) (internal quotation marks omitted). Scarberry needs to show a willful violation since she filed the present case on August 8, 2016, more than two years after her August 28, 2013 termination.

## V. ANALYSIS

### A. Prima Facie Case

The parties agree that Scarberry has established the first three elements of a prima facie case of retaliation, since (1) she availed herself of FMLA leave; (2) Michigan Bell knew that she availed herself of FMLA leave; and (3) Michigan Bell terminated her employment. Thus, the Court must determine whether there is a genuine issue as to the causal connection between Scarberry's use of FMLA leave and Michigan Bell's termination decision. "To establish the causal connection . . . a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not [taken the protected action]." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

Scarberry says that the temporal proximity between her request for FMLA leave and Michigan Bell's termination decision shows a sufficient causal connection to make

out a prima facie case. While temporal proximity alone may be enough to support a prima facie case "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity," Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008), it does not do so in all circumstances. Nguyen, 229 F.3d at 567 ("[W]hile there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference, we do not hesitate to say that they have not been presented in this case.").

The Court is not persuaded that the temporal proximity in this case, albeit extremely close, carries much significance. Since Scarberry requested FMLA leave on a very regular basis, any adverse employment action would likely fall close in time to at least one leave period. This is magnified by the fact that a called-in complaint, not a management decision, was what initiated the investigation into Scarberry's conduct history. See Nguyen, 229 F.3d at 567 ("[T]emporal proximity alone was not particularly compelling, because . . . there was substantial evidence supporting the defendant's version of the events."). On the other hand, if Michigan Bell decided to retaliate against Scarberry's long-term pattern of FMLA use, as she contends, any adverse action taken would also fall close in time to some requested leave period.

Scarberry also says that the comments made by Kline, Smolarek, and Breternitz-Prebay evidence a causal connection because those supervisors were involved in the termination decision. These comments also do little to establish a prima facie case since they were of a general nature, and Scarberry does not say when they were made. However, despite the weaknesses of both the temporal proximity and the manager comments, they are enough to establish a prima facie case since "[t]he burden of

9

establishing a *prima facie* case in a retaliation action is not onerous, but one easily met."
A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013) (quoting Nguyen, 229 F.3d at 563) (internal quotation marks omitted).

### B. Nondiscriminatory Reason

As noted above, Michigan Bell says that Scarberry was terminated because she changed a customer's service plan without receiving the customer's permission. Because this reason has nothing to do with Scarberry's FMLA use, Scarberry must show that it was only a pretext for her termination.

### C. Pretext

### 1.

Scarberry advances several reasons to support her assertion that Michigan Bell's provided reason for her discharge was pretextual:

1. The comments such as "because you're not here…" from supervisors Kline, Smolarek, and Breternitz-Prebay show discriminatory intent;
2. McMillan's refusal to address Scarberry's comment regarding FMLA leave in a group setting shows discriminatory intent;
3. Supervisors instructed the sales representatives to tell customers that the account change at issue was mandatory;
4. Other sales representatives told customers the account change was mandatory without being disciplined;
5. The supervisors who made the termination decision improperly relied on Scarberry's past code of conduct violations since those violations had been removed from Scarberry's record;

6. When Scarberry made an unauthorized change to a customer account in the past, she was only suspended, not terminated;

7. Other sales representatives who committed code of conduct violations were only suspended, not terminated;

8. When Scarberry requested her employment file from Michigan Bell after she was terminated, it took two years and a court order before Michigan Bell gave her the file; this shows that Michigan Bell had something to hide;

9. In a request for arbitration, Miller wrote that she believed Scarberry could have felt justified in thinking that she had permission to make the change for three reasons: (1) the recording reflected that the individual asked for additional information to be emailed to her regarding the change; (2) the individual did not complain when Scarberry read her the account number and date when a service technician would come out to make the change; and (3) Scarberry's immediate supervisor Tucker did not discipline Scarberry for any of the calls in which she had used mandatory language or made changes without customer approval.

**2.**

Since Scarberry admits to changing a customer's service plan without authorization, only prongs two and three of the Sixth Circuit pretext test must be evaluated. As to the second prong, a plaintiff must show that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds by Geiger v. Tower Automotive, 579 F.3d 614 (6th Cir. 2009)). The third prong "consists of evidence that

other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." Id. at 1084. "The relative severity of two actions is not determined solely by whether those actions violated the same company rule or policy. . . . Instead, employers—and therefore courts—are free to consider both the actual and potential consequences of the employee's actions." Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 780 (6th Cir. 2016).

**3.**

None of Scarberry's evidence serves to defend her against summary judgment. The Court addresses each of Scarberry's assertions as enumerated above:

1. Scarberry has not provided details about her supervisors' FMLA comments other than their general nature and that they occurred at some point in the past. Since Scarberry took frequent FMLA leave, it is not unlikely that her supervisors might comment in some way about other employees taking on extra work. Other than the fact that the comments referred to Scarberry's absences, there is no evidence to support a finding that there is a genuine issue of material fact as to whether the supervisors made the comments out of animosity toward Scarberry's FMLA use.

2. McMillan's not addressing Scarberry's comment in front of a group of co-workers is even less suggestive of animosity. McMillan did not refuse to address the comment but simply stated she wanted to address it in a different setting. (Scarberry Dep. 66).

3. Even accepting as true that Michigan Bell supervisors told sales representatives to tell customers that account change was mandatory, there is no evidence that supervisors instructed sales representatives to actually make a change to a customer's account without the customer's approval. While using mandatory language to gain customer approval might not be a transparent sales tactic, there is still a distinction between an effort at approval and proceeding absent approval. If the change was truly required, Michigan Bell could have simply made it without instructing employees to make a sales call. Scarberry relies on testimony from co-worker Veronica Bauer (Bauer) that supervisors told employees to tell customers the changes were mandatory. (Bauer Dep. 15-17, 20). Bauer also testified, however, that she knew she could not make changes if despite her most convincing sales pitch, a customer still refused approval. (Id. at 23). Scarberry also testified that she understood it was unacceptable to make a change without customer approval. (Scarberry Dep. 68-72). Therefore, the evidence regarding mandatory language does nothing to establish that Scarberry was not terminated for making an unauthorized change.
4. Scarberry has not offered appropriate comparisons. None of the co-worker activities she relies on involved making an unauthorized change. It makes no difference that her co-workers were not disciplined for using mandatory language, since the consequences of using mandatory language as part of a sales pitch are less severe than those of making an unauthorized change to a customer's account.

5. Because changing a customer account without authorization is a terminable offense, Michigan Bell could have terminated Scarberry without considering any past discipline. And because Michigan Bell considered other incidents of past unauthorized changes that had not been removed from Scarberry's record, whether it was justified in relying on some past disciplinary incidents is inconsequential.

6. The fact that Scarberry was only suspended for making unauthorized changes in the past makes no difference, as her suspension letter specifically states that she could be terminated the next time she engaged in similar conduct. (Doc. 21-14). Though that letter mentioned "slamming" as the offense, "slamming" and "cramming" both involve making unauthorized changes to a customer's account and are considered together in the employee code of conduct. (Doc. 18-4).

7. Again, the fact that co-workers were disciplined differently for violating the code of conduct in ways other than making an unauthorized change to a customer account does nothing to advance Scarberry's case.

8. Scarberry offers no evidence that the conduct any of the Michigan Bell employees relevant to this case had anything to do with the fact that Scarberry experienced difficulty procuring her employee file. Absent a causal link, no inference in Scarberry's favor can be drawn.

9. Finally, Miller's testimony does not show that Michigan Bell was incorrect to conclude that Scarberry made an unauthorized change. At best, the individual's tacit acceptance of the order created an ambiguity that Michigan Bell had to exercise business judgment to resolve. Courts defer to business judgment to

avoid "the illegitimate role of acting as a 'super personnel department,' overseeing and second guessing employers' business decisions." Bender v. Hecht's Dep't Stores, 455 F.3d 612, 627 (6th Cir. 2006); cf. Philbrick v. Holder, 583 F. App'x 478, 487 (6th Cir. 2014) ("If the asserted business judgment is so 'ridden with error' that the employer could not have honestly relied on it, pretext may be shown."). Notably, CWA president Kevin Miller expressed during the initial investigatory meeting that he did not believe Scarberry had received appropriate authorization (Doc. 18-14, Pg ID 313), and the individual called back to complain that the change had been made without authorization. (Scarberry Dep. 104-05). As to the lack of previous discipline, Scarberry provides no evidence that Tucker or any other supervisor knew about the previous times Scarberry made an unauthorized change to a customer's account and chose not to discipline her. Miller testified that "[t]he managers would listen to calls and coach them" but also that she did not know if the set of calls at issue were eligible for manager observation. (Miller Dep. 57-59).

No reasonable jury could rely on this evidence to find that Michigan Bell more likely than not made its termination decision for reasons other than Scarberry's actions on August 9, 2013. Scarberry's statements at the Union-Management Review Board meeting make clear that she sincerely believed she was not violating the code of conduct (Doc. 18-14, Pg ID 365-75), but Michigan Bell had the right to terminate her even if she violated it unintentionally. The Court therefore declines to find that there is a genuine issue as to the fact that Scarberry's code of conduct violation was sufficient to warrant her termination.

### D. Willfulness

Since there is no genuine issue as to the fact that Michigan Bell's proffered reason for terminating Scarberry was not a pretext, the Court need not analyze whether any purported FMLA violation was willful.

## VI.   CONCLUSION

In sum, Scarberry has not sufficiently rebutted Michigan Bell's provided reason for terminating her. Michigan Bell is therefore entitled to summary judgment.

SO ORDERED.

s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: March 28, 2018
Detroit, Michigan